## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of: B.D., W.D.D., and L.D. (Minor Children) Children in Need of Services and W.D. (Father),

*Appellant-Defendant*,

v.

The Indiana Department of Child Services,

*Appellee-Plaintiff*.

July 28, 2017

Court of Appeals Case No. 49A04-1701-JC-2

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Danielle P. Gaughan, Magistrate

Trial Court Cause No.
49D09-1605-JC-1569
49D09-1605-JC-1570
49D09-1605-JC-1571

**Brown, Judge.**

[1] W.D. ("Father") appeals the trial court's order determining that B.D., W.D.D., and L.D. (the "Children") are children in need of services ("CHINS"). We revise and restate the issues presented as whether the evidence is sufficient to support the court's determination. We affirm.

*Facts and Procedural History*

[2] C.F. ("Mother") is the mother of B.D., born in April of 2009, W.D.D., born in April of 2010, and L.D., born in January of 2013. The Indiana Department of Child Services ("DCS") received a report in May 2016 that the Children were not in school, were dirty, and had been in the car with Mother and her boyfriend when the car flipped over following a chase by police.

[3] On May 11, 2016, DCS filed a petition alleging the Children are CHINS. The petition alleged that Mother failed to provide the Children with a safe, stable, and appropriate living environment; while in the care of Mother and her boyfriend the Children were involved in a high speed law enforcement pursuit which resulted in the vehicle rolling over with the Children inside; the Children were not in car seats or restrained; Mother and the Children are homeless; the Children were observed with poor hygiene and disclosed not having eaten since lunch the day before; two of the Children were found to have lice; the Children were not enrolled in school due to Mother not being able to verify a residence; and Father had not successfully demonstrated an ability and willingness to appropriately parent the Children and/or is unable to ensure their safety and well-being while in the care and custody of Mother. Also on that date, petitions

to establish paternity and provide support were filed requesting that the court enter an order regarding current and past-due child support and medical support.[1]

[4] On August 8, 2016, the court held a fact-finding hearing at which Mother and Father were present and represented by counsel. Mother admitted that the Children were CHINS. She specifically admitted she needs assistance maintaining stable and suitable housing; agreed to participate and follow the recommendations of home-based therapy, home-based case management, and a family functioning assessment; and admitted the coercive intervention of the court is necessary to ensure the Children's safety and well-being. The court took Mother's admission under advisement until the close of evidence regarding to Father.

[5] Family case manager Denise Deen ("FCM Deen") testified that Mother had legal custody of the Children and Father lived in Virginia. FCM Deen testified the Children have behaviors for which they are in therapy and indicated B.D. throws things and has anger outbursts, L.D. exhibits kicking, hitting, and crying, and W.D.D. sometimes does not follow directions and needs to be

---

[1] The petitions included in the record state "Comes now the Child by Next Friend [Mother]" but appear to be signed by Father. *See* Appellant's Appendix Volume II at 123, 126, 129. Father states in his appellant's brief that he filed petitions for custody on May 11, 2016, DCS states in its appellee's brief that Mother filed the May 11, 2016 petitions, and Father states in his reply brief that he signed the paternity petitions on May 11, 2016, that the petitions were confusing because they state they were filed by Mother but were signed by him, and that the petitions ended up being unnecessary because it was later discovered that Mother and Father had already completed paternity affidavits. The record includes paternity affidavits signed by Mother and Father at the times of the Children's births.

redirected. She indicated that, from what she observed, Father loves the Children, that she had a concern about Father being able to appropriately discipline the Children, and she did not observe any redirection from Father during the two visits she supervised.

[6] When asked if she had any concerns about Father's ability to provide financially for the Children, FCM Deen replied affirmatively and testified that Father stated he receives $733 a month and "I did ask how he would provide for the kids. He said he works on his aunt's farm and he has money saved is what he told me." Transcript Volume II at 15. When asked if Father had arrangements in place for the Children to have therapy in Virginia, she answered "[n]ot that he told me," and when asked if he had schooling arranged for the Children, she answered "[n]ot to my knowledge, no." *Id.* She indicated that Father told her he had therapy with a psychiatrist, she had contacted the therapist and was able to obtain information about Father's mental health treatment, and the information concerned her in terms of Father's ability to provide for the Children. She also stated that Mother is currently engaged in services in Indiana, meets regularly with her home-based therapist, visits with the Children, is receiving case management, and was referred for a family functioning assessment. When asked if it was in the Children's best interest to move to Virginia to live with Father, FCM Deen answered, "[n]o" and "[a]s I stated before . . . [M]other is doing services currently. The plan is reunification. Services just basically started and we have to give [M]other a chance to participate in services to prove herself pretty much." *Id.* at 18. When asked

"[i]f the Children were to go to live with [F]ather in Virginia would it be your recommendation for that to occur today or with a transition plan," she answered "I would say with a transition plan. We would need an approved ICPC, State of Virginia to go out and assess [Father's] home and make recommendation back to Indiana before we can move the kids." *Id.* at 18-19. FCM Deen indicated the Children are currently placed in foster care and she was not recommending placement with Father, and when asked if she felt that Father needs to engage in services in order to safely place the Children in his care, she replied affirmatively and stated she believes he needs to continue his mental health treatment and a family functioning assessment. She also testified she was unable to recommend case closure and was asking the court to find the Children to be CHINS. On cross-examination, she testified the car accident involved Mother's boyfriend, Mother reported they were being chased by the police and the car flipped over, and to her knowledge the Children were not wearing safety belts at the time of the incident.

[7]     Father testified he lives alone for free in a house in Virginia owned by his aunt, that he had lived there for probably four months, he previously lived in his aunt's house for about five months, and that prior to that he lived with his stepfather. He stated he that he is not employed and receives a disability check for mental health for $733 per month, his mental health diagnoses are depression and anxiety, he receives medications, and he tried to kill himself around December 2015 or January 2016. He testified that his mother had passed away and he could not deal with it, he began to drink, and he went to an

in-patient facility in Virginia for a week. He stated he was not currently drinking, the last time he drank was probably nine months earlier, and he did not do any "drug – alcohol . . . treatment." *Id.* at 29.

[8] Father indicated he daily takes Trazadone for anxiety and to sleep and Celexa for depression, and that he was seeing his therapist at the Lake County Behavioral Center once a month. He testified the last time he was the primary caretaker for the Children was the previous summer, that during that time he was experiencing depression, and he and the Children were living with his stepfather in Indiana. When asked how the Children ended up with Mother, Father replied "[t]hey was supposed to go back to school." *Id.* at 31. He indicated the Children returned to Mother's care at the end of July of 2015. As for his move to Virginia, he stated "I couldn't live up here anymore, couldn't deal with you know – things start . . . ." *Id*. When asked what contact he had with the Children since he moved, Father answered that he called them a few times but that he had no face-to-face contact with them between August of 2015 and when this case opened in May of 2016. He indicated he is prepared to have the Children in Virginia, has a place to take them and the means to take care of them, and can arrange for the same therapy they are receiving here.

[9] When asked if he felt he could financially support the Children on a $733 monthly disability check, Father answered affirmatively, and when asked "[h]ow much you think it costs to feed three children a month," he answered "[w]ell not that it's any of your guys' business, but my aunt and uncle don't make me pay anything and they got a lot of money so they help me." *Id.* at 33.

Father indicated that he had established paternity, that he had not filed for custody of the Children "[b]ecause [he] was unaware that [he] needed to," that it was his intention to request primary physical custody, and that Mother "can come see them if she wants. I'm not trying to keep them from her. I'm trying to put them in a place where it's stable where they can be taken care of." *Id.*

[10] On cross-examination, Father testified he helped his aunt and uncle take care of their properties, makes repairs, does their yard work and anything they need him to do, and that "it's not something that will keep me from being able to take care of my kids because I don't have to help them. I choose to, yes and they understand that." *Id.* at 35-36. He stated that he lives in a double wide, his water bill is usually about thirty-three dollars a month, and the electric bill is cheap because it has a brand new heat pump. When asked if he had any other family members living in the area, he responded that his grandmother has lived at her house for thirty-two years and he has another aunt who owns a farm, works at the BMV, and lives about twenty to twenty-five minutes away. He indicated he had medical coverage for his therapy through Medicaid, and that he was willing to do whatever is necessary to obtain medical coverage for the Children and to provide them with the type of therapy the doctors and therapist believe they need.

[11] Father's stepfather testified that Father and Mother moved to Indianapolis for maybe three months and then showed up at his doorstep with no place to go with the Children and he took them into his home. He stated the Children lived with him between February and April of 2015 while Father lived in

Virginia, and again from September through December 2015, that Father called the Children every day during these periods, and that in December 2015 the Children went back to Mother.

[12] Counsel for DCS argued that it had presented significant mental health concerns regarding Father; that "[a]t this point you haven't heard any evidence about his ability to parent in light of his mental health issues and the risks of having three children suddenly in his care who have behavioral issues poses a safety risk for the children in light of those mental health issues"; Father lacked the financial ability to provide for the Children and relied on others to provide housing and monetary support; and there was a large lapse in time in his contact with the Children. *Id.* at 50. Counsel further argued that "Mother has custody of [the Children], he has not established primary physical custody of them, so if the Court finds no CHINS today then legally the children return to [M]other who is currently engaged in services and making progressing [sic], but not ready for reunification." *Id.* at 50-51.

[13] Father's counsel argued: "So, at this point your honor obviously if you find the child is not in need of services as to my client and we, we need to have a custody hearing to deal with some these other issues, but it seems to me that he's done everything that's required of him to be a good father." *Id.* at 53. The court took the CHINS determination under advisement and scheduled a custody hearing for September 26, 2016.

[14]     On September 6, 2016, Father filed a motion for custody stating that Mother had entered an admission the Children were CHINS, he denied the Children were CHINS and was willing and able to care for them, paternity for the Children was established after the CHINS case was filed, no order of custody had been entered in the paternity cases, and it was in the Children's best interest that legal and physical custody be awarded to him.

[15]     On September 26, 2016, the court held a custody hearing. Mother testified that she obtained housing in a duplex following the last court date, was working at a gas station, and she participated in the services provided through DCS including home-based therapy and case management, and that she visited the Children about once a week for about six hours. When the court asked, "[b]efore the filing of the child in need of services petition the [C]hildren were for the most of time in your care, is that right," Mother responded affirmatively. *Id.* at 66. DCS indicated the Children were in foster care, recommended they remain in their placement, and noted that Mother does have housing and that, once a fire extinguisher and smoke detectors are in place, DCS would look at moving the visits into the home and proceeding from there.

[16]     The guardian ad litem ("GAL") stated she observed the Children about a month earlier and they were doing fine in their foster care, that Mother is doing well with her visits, the Children were looking forward to some normalcy again with Mother, they always talk about Mother and that they miss her, and that after the Children move back into the home she would like to see them receive home-based therapy. She was in agreement with DCS that the Children remain

with Mother. The court took the CHINS determination and custody decision under advisement.

[17] On November 7, 2016, the court held a ruling hearing at which it denied Father's motion for custody and found the Children to be CHINS. Mother's home-based case manager indicated she was continually working with Mother who was meeting DCS guidelines and safety plan, and that Mother had maintained employment and obtained housing.

[18] In a written order dated November 15, 2016 titled "Ruling Hearing Custody" the court stated "Mother has admitted that the children are in need of services and her admission and the CHINS finding are under advisement until the resolution of this custody matter." Appellant's Appendix Volume II at 144-145. The court found that it is not in the Children's best interests to be uprooted from Indiana, distanced from Mother, and moved to Virginia given that Mother has made progress toward reunification; Father has been living out of state for approximately a year and, though he has housing and income, the bond that the Children have with Mother is a closer bond than Father has been able to maintain, Father chose to leave the state a year ago and has mental health issues; and it is not in the best interests of the Children that custody be modified.

[19] The court also entered an order finding the Children to be CHINS. *Id.* at 102. It accepted Mother's previous admission, and found that Father needs to continue to participate in therapy. The order states: "Based on Mother's

admission, the denial under the paternity causes of Father's Petition for Custody, Father's mental health issues and the therapeutic needs of the [C]hildren, the court finds that the [C]hildren are [CHINS] and the coercive intervention of the Court is necessary." *Id.* at 103.

[20] On December 5, 2016, the court held a dispositional hearing and entered a dispositional order finding that the responsibility for placement and care of the Children was with DCS and that the permanency plan was reunification. A placement review hearing was scheduled for March 2017.

## *Discussion*

[21] The issue is whether sufficient evidence supports the trial court's determination that the Children are CHINS. In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[22] Ind. Code § 31-34-1-1 provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.,* 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the child. *Id.*

[23] Father argues there was insufficient evidence that the Children's needs were unlikely to be met without the coercive intervention of the court, and that, while he cannot contest Mother's admissions that she would be unable to provide safe housing without court intervention, DCS has not shown that he would be unwilling or unable to meet the Children's needs without a court order. He states he signed paternity affidavits when each of the Children were born, that he had done everything he could to gain custody, and that the court's decision to deny his petition for custody does not support the CHINS determination. With respect to his mental health he contends that a CHINS

determination cannot be based on conditions that no longer exist and that he is stable, and that his testimony shows that the coercive intervention of the court would not be necessary to ensure the Children continue with therapy and have their needs for housing and financial support met. He also argues that, if this court affirms the CHINS determination, the case should be remanded for a new dispositional order which complies with statutory requirements.

[24] DCS responds that Mother's admissions can serve as a basis for the CHINS adjudications and the court did not base its conclusion solely on Mother's admission. DCS further argues that the denial of Father's custody petition supports the CHINS adjudication, the issue of custody was squarely before the court, and the court's denial of Father's request for custody demonstrates the court's intervention was needed because it was not in the Children's best interests to be placed with Father. It also maintains the dispositional order satisfies statutory requirements, the dispositional order incorporated DCS's predispositional report which noted Father's custody request was denied, and the custody order reflects the reasons why the court did not place Children with Father.

[25] In his reply brief, Father maintains that his argument on appeal does not depend on whether the court correctly decided the custody issue, that the custody decision does not show the coercive intervention of the court was necessary to provide for the Children's needs, and that a custody decision is not a determination that a parent is unfit or that it would be harmful for a child to be placed with the parent.

[26] We observe that the Indiana Supreme Court has held that, when one parent wishes to admit and another parent wishes to deny the child is in need of services, the trial court shall conduct a fact-finding hearing as to the entire matter. *In re K.D.*, 962 N.E.2d 1249, 1259 (Ind. 2012). The court here, consistent with *K.D.*, conducted a fact-finding hearing prior to accepting Mother's admission. *See Matter of D.P.*, 72 N.E.3d 976, 982 (Ind. Ct. App. 2017) (noting that "[t]he necessary takeaway after *K.D.* is that, although one parent's admission *may* be sufficient to support a CHINS adjudication, it is not *automatically* sufficient" and that "[t]he trial court, evidently aware of *K.D.*'s holding, did not immediately accept Mother's admission but took it under advisement pending completion of the fact-finding hearing").

[27] The record reveals that testimony was elicited at the August 8, 2016 fact-finding hearing which supports the court's findings in its November 15, 2016 order that Mother admitted she cannot provide safe and stable housing for the Children, that Father moved to Virginia in August 2015, he was diagnosed with depression after attempting suicide in December 2015 or January 2016, he receives medication to sleep and for anxiety and sees his therapist once a month, that the last time the Children were with Father full-time was the summer of 2015, the Children are in therapy for behavioral issues, and that prior to DCS's involvement the Children had been in Mother's care. As Father notes, he is not challenging the denial of his request for custody. While the fact the court declined to place the Children with Father may not, standing alone, render them CHINS, we cannot conclude that the court was precluded from

considering the fact it had found it was not in the Children's best interests to be placed with Father, together with the evidence regarding the care provided by Mother and her admission, in considering whether the Children were in need of care, treatment, or rehabilitation that they were not receiving and were unlikely to be provided or accepted without the coercive intervention of the court. *See* Ind. Code § 31-34-1-1. The court in its CHINS ruling found that, while Mother had obtained employment and housing, she admitted she needs assistance to provide the Children with stable housing and that, based on her admission, together with the court's decision not to award custody to Father, his health issues, and the Children's therapeutic needs, that the Children were in need of services and the coercive intervention of the court was necessary. Based upon the record, we conclude that the judgment reached by the trial court is not clearly erroneous.

[28] As for Father's argument the dispositional order is inadequate, Ind. Code § 31-34-19-10 provides a dispositional order must include written findings and conclusions regarding in relevant part the needs of the child, the need for participation by a parent in the plan of care for the child, efforts made to prevent the child's removal from or reunite the child with the parent, family services that were offered and provided to a child in need of services or the child's parent, and the court's reasons for the disposition. The statute also provides that the court "may incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record in the court's dispositional decree." Ind. Code § 31-34-19-10(b). Also, Ind. Code §

31-34-19-6 provides in part that the court shall enter a dispositional decree that is "in the least restrictive (most family like) and most appropriate setting available" and "is least disruptive of family life." The court's dispositional order included findings that reasonable services have been offered and are available for preventing or eliminating the continued need for removal of the Children and the possibility of reuniting the family. Moreover, the order provided that the statements of reasonable efforts made in the reports and documents of DCS were incorporated by reference, the predispositional report filed by DCS on December 5, 2016 stated that Father's request for custody had been recently denied, and the court's November 15, 2016 order denying Father's motion for custody set forth findings setting forth its reasons for not placing the Children with Father, including findings regarding the Children's best interests, and acknowledged the behavioral issues of the Children, Father's health issues, and Mother's admission. We cannot say the lack of additional or more specific findings in the dispositional order requires reversal or remand.

## *Conclusion*

For the foregoing reasons, we affirm the trial court's determination that the Children are CHINS.

Affirmed.

May, J., and Pyle, J., concur.